Hugh R. Bowman v. Commissioner.
Bowman v. Commissioner
Docket Nos. 5008, 8604.
United States Tax Court
1949 Tax Ct. Memo LEXIS 230; 8 T.C.M. (CCH) 309; T.C.M. (RIA) 49080; March 29, 1949
*230 Evidence held sufficient to establish that one-half of the income of the business of wheat farming involved herein is taxable to the petitioner's wife rather than the petitioner. Wm. B. Finlay, C.P.A., First Nat'l Bank Bldg., Great Falls, Mont., and G. G. Harris, Esq., Great Falls, Mont., for the petitioner. John H. Pigg, Esq., and Robert G. Harless, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: These proceedings, which were consolidated for hearing, involve the following deficiencies: Docket
No.
Year
Deficiency
Nature of Tax
5008
1940
$ 82.55
Income tax
5008
1941
9,735.31
Income tax
8604
1943
23,411.33
Income and vic-
tory tax
The year 1942 is involved by reason of the "forgiveness" provisions of the Current Tax Payment Act of 1943, relating to the tax for 1942 and 1943. The question presented is whether the respondent erred in taxing one-half of the income of the business of wheat farming to the petitioner rather than to his wife. There is no dispute as to the amount of the income from the business as adjusted by the respondent. An issue involving the deduction of a *231 penalty of $6,932.07 paid under the Agricultural Adjustment Act of 1938 for overseeding wheat was abandoned by the petitioner at the hearing. In Docket No. 5008, the petitioner claims a refund of $399.50 on account of a "net overassessment" for 1940 and 1941. Findings of Fact The petitioner, Hugh R. Bowman, is a resident of Belt, Montana. He was a resident of Belt during the years 1940 to 1943, inclusive, and filed income tax returns for those years with the collector of internal revenue for the district of Montana. Ruth Anna Bowman, sometimes referred to herein as Mrs. Bowman, is the wife of the petitioner. She married the petitioner in Sioux City, Iowa, in February, 1916. They have two sons who were 18 and 10 years of age, respectively, in 1940. The petitioner was reared near a blacksmith shop and, after completing the eighth grade in school, he worked as a mechanic in Sioux City for several years. He belonged to the sheet metal workers' union. He had no experience in farming prior to 1924. Mrs. Bowman was educated in a country school in Nebraska, where she went through the fifth grade, and, prior to her marriage to the petitioner, she worked on a farm. In September, *232 1916, the petitioner and his wife moved to Great Falls, Montana, where they rented space in a tire repair shop and went into the business of repairing automobile radiators. They lived in a one-room apartment near the shop. When they left Sioux City they had about $550 in cash, including $150 which Mrs. Bowman received from her parents as a wedding present. Some of the $550 was used to pay for transportation from Sioux City to Great Falls. Their living expenses during the first few weeks were paid from earnings of the business, which amounted to $200 during the first month. Most of the $550, including about $100 belonging to Mrs. Bowman, was used to buy tools and equipment for the radiator repair business and for shop rent, gas, lighting, and other business expenses. Mrs. Bowman had been divorced from a former husband prior to 1916, and in 1917, 1918, and 1919, in a settlement of her property rights, she received amounts totaling $1,500, which she contributed in those years to the capital of the radiator repair business. In 1920 the petitioner and his wife, with funds of the radiator repair business, purchased the business and equipment of the tire repair shop and thereafter repaired *233 tires and radiators. The petitioner spent his entire time on the mechanical work. Mrs. Bowman's household duties were light, and she solicited repair jobs, distributed business cards and other advertising matter, waited on customers, took care of telephone calls, prepared bills, made all collections. She also spent part of her time placing fittings on radiators and soldering. She devoted from seven to eight hours per day to the performance of these duties and was never paid any salary. In 1918 the petitioner and his wife purchased a 201-acre farm, known as the Salem ranch, situated near Great Falls, Montana. Farms in that locality are commonly referred to as ranches. The Salem ranch was purchased on March 1, 1918, for a consideration of $3,400. The sum of $1,000 was paid when the contract was signed, with $800 raised on a mortgage of the property of the radiator repair business and with $200 withdrawn from the cash funds of that business. The balance of the purchase price was represented by notes signed by the petitioner and his wife and secured by mortgages on the ranch. The petitioner's relatives lived on the ranch for several years. In 1923 the petitioner and his wife purchased *234 a 160-acre farm, known as the Ellen S. Eustance ranch, for a consideration of $3,200. The contract of purchase, dated March 3, 1923, was signed by the petitioner and his wife. It provided for an initial cash payment of $500, for payment of the balance of the purchase price in annual installments of $500, and for the deposit in escrow, upon the signing of the contract, of a deed conveying the land to Hugh R. Bowman. After repeated urging of petitioner by his wife to sell the radiator and tire repair shop and take up farming as a business, and upon being advised by his physician that he give up his work in the shop, the radiator and tire repair business was sold in 1923 for $2,600, all of which upon final payment in 1924 was used to purchase farm machinery and other equipment for the Salem ranch. In 1924 the petitioner and his wife moved out to the Salem ranch, and they have been engaged in the business of wheat farming in the vicinity of Great Falls ever since, their operations having grown by 1940 to embrace approximately 10,000 acres of farm land, including leased land. In 1925 the petitioner and his wife began to farm an additional 1,000-acre tract leased from William H. Boyle. *235 The original lease of the Boyle land was made in the name of the petitioner, but, after it had expired in 1927, and up to and including 1943, the petitioner and his wife continued to farm the land under oral agreements made with Boyle at the end of each year. The oral agreements were made sometimes by the petitioner and sometimes by Mrs. Bowman. Since 1930 most of the oral agreements with Boyle have been made by Mrs. Bowman, and most of the wheat produced on this tract and in which, under the agreements, Boyle had a one-third share, has been sold in accordance with her orders. The purchase money mortgage on the Salem ranch was paid prior to 1927, and the mortgage was released on October 3, 1927. The petitioner and his wife thereafter mortgaged the Salem ranch as security for two loans. A loan of $1,200 by the Conrad Banking Corporation was made on March 17, 1928, and was paid six months later; and a loan of $2,500 by Milton K. Loyan was made on April 30, 1929, and was paid on August 15, 1929. The mortgages securing both loans were executed by the petitioner and his wife and the mortgage notes were signed by both of them. During the period from 1927 to 1930 the petitioner and his *236 wife extended their farming operations to additional acreage through the purchase, on the dates and at the prices indicated, of the following ranches: Name of property
Date of Contract
Acreage
Purchase Price
Keator ranch
June 4, 1927
160
$ 5,000
James B. Moore ranch
March 7, 1928
320
4,250
J. N. Thelen ranch
Sept. 19, 1928
200
2,600
Hollam ranch
April 30, 1929
563
14,087
Clark & Eaton ranch
(?)
480
10,080
Three payments of $1,000 each were made on the Keater ranch in 1927 and 1928. The sum of $500 was paid on the Moore ranch on March 7, 1928, and payments of $500 and $650 were made in 1928 and 1929. The sum of $500 was paid on the Thelen ranch on September 19, 1928, and a payment of $1,100 was made in 1929. The balances due on purchase price of the Keator, Moore, and Thelen ranches, and the purchase price of the Clark & Eaton ranch were paid on dates not disclosed by the record. The Keator ranch was conveyed to Hugh R. Bowman on June 22, 1929, and the Clark & Eaton ranch was conveyed to him on May 31, 1930. The record does not disclose whether the Thelen and Moore ranches were conveyed to the petitioner or to Mrs. Bowman. The sum of $2,500 *237 was paid on the Hollam ranch on April 30, 1929, with the $2,500 borrowed from Milton K. Loyan on the Salem ranch, and additional payments on the purchase price, amounting to $1,587, were made in 1929 and 1930. The final payment on the Hollam ranch, in the amount of $10,000, together with accrued interest, was made on August 28, 1943, and, on September 2, 1943, the ranch was conveyed to "Hugh R. Bowman, Sr. and Ruth A. Bowman, his wife, as joint tenants." In 1934 the petitioner applied for a loan of $33,200, under the Federal Farm Loan Act, on the several ranches hereinabove mentioned, including the Hollam ranch. A loan in the amount of $22,000 was authorized, and mortgages for that amount on all of the ranches, except the Hollam ranch, were executed by the petitioner and his wife under date of May 1, 1934, together with mortgage notes signed by both of them. The application, which was signed by the petitioner, contained a statement by him that he farmed the land himself, in answer to a question of whether the land was farmed wholly or partially by tenants. The Federal Land Bank was represented in this transaction by C. M. Storm, secretary of the Great Falls National Farm Loan Association, *238 and the transaction was closed on December 4, 1934. Mrs. Bowman conceived the idea of obtaining the Federal farm loan and induced the petitioner to file the application. Storm made an independent investigation of the property and the farming operations. Mrs. Bowman attended about ten conferences in Storm's office and took part in the discussion and decision of all matters affecting the loan. Storm believed, from the information obtained in the course of his investigation and from his conversations with Mrs. Bowman, that she had an interest in the farm property and he considered her experience in farming and the work she was doing in carrying on the operations as added reasons for approving the loan. The installments of principal and interest were paid on the mortgages over the period 1935 to 1942, and the unpaid balance of the loan, amounting to $13,344.17, was paid on January 13, 1943. In 1936 the petitioner and his wife extended their farming operations to a 960-acre farm situated about ten miles from the Salem ranch and known as the Longeway ranch. In the following year they moved their home to the Longeway ranch and thereafter carried on the farming operations from that point. *239 The Longeway ranch was purchased on April 24, 1936, for $10,000. The sum of $2,000 was paid on April 24, 1936, by Mrs. Bowman with $2,000 which she borrowed on her unsecured note from a personal friend, Mrs. A. J. Maly. Payments on the Longeway contract, amounting to $2,000, were made between 1936 and 1940, and the balance of the purchase price, amounting to $5,500, plus accrued interest, was paid on September 5, 1941. The record does not disclose whether the Longeway ranch was conveyed to the petitioner or his wife. The $2,000 borrowed from Mrs. Maly was repaid on September 30, 1943. In 1938 the petitioner and his wife purchased an 800-acre ranch, known as the William Legault ranch, for $9,600. The contract of purchase, dated May 21, 1938, was signed by the petitioner and his wife. It provided for an initial cash payment of $1,500, for payment of the balance of the purchase price in annual installments of $1,500, and for the deposit in escrow, upon the signing of the contract, of a deed conveying the land to Hugh R. Bowman. Payments amounting to $6,000 were made between 1938 and 1941, and the balance of the purchase price, amounting to $3,600, was paid on October 20, 1941. In *240 1940 and 1941 the petitioner and his wife leased and included in their farming operations over 3,280 additional acres of farm land. This acreage included 800 acres leased to Hugh R. Bowman by the State of Montana on May 28, 1940; 400 acres, known as the Stowe ranch, leased to Mrs. Bowman on September 14, 1940; 640 acres leased to Hugh R. Bowman and Mrs. Bowman by James M. McGiffin on October 8, 1940; and a tract of 1,440 acres of land, known as the Red Coulee land, leased to Mrs. Bowman by Albert Woehner on December 31, 1941. The Stowe lease was purchased from Bob Mayberry, original lessee, by Mrs. Bowman, together with the growing crop and some farm machinery, for $1,800. The Red Coulee lease was negotiated by Mrs. Bowman without consulting the petitioner. The petitioner and his wife at all times considered the land, leaseholds, and other property acquired in the course of the farming operations, and the income derived from such operations as belonging to them equally, without regard to the name in which the legal title was held. The petitioner kept ledger accounts in which he entered, under the name of each ranch, the contract price and date of purchase, and, as principal and interest *241 were paid, he noted the amount thereof and the date of payment. The ledger accounts kept by petitioner did not purport to show that the petitioner and his wife held equal interests in any of the properties, and the petitioner's books contained no accounts purporting to show how much was contributed by the petitioner and his wife to the purchase of the properties, nor any accounts in their individual names showing credits for their respective shares of the earnings or charges for amounts withdrawn by them from the business. Since beginning farming operations in 1924 the petitioner and his wife have never divided or distributed any of the earnings of the business, and have never maintained separate bank accounts, either checking or savings. The several ranches hereinabove mentioned and the farm machinery and equipment were paid for out of the earnings from farming during the period from 1924 to 1943, with the exception of the payment of $1,000 on the Salem ranch and the investment of $2,600 in farming machinery, both of which amounts were paid out of the earnings and assets of the repair shop. The petitioner and his wife maintained one account until 1933 with the Conrad Banking Corporation *242 of Great Falls, and, after that year, with its successor, the Montana Bank & Trust Co. They also maintained one account with the Belt Valley Bank, of Belt, Montana, during the taxable years and for some years prior thereto. The accounts at these banks were joint accounts, subject to withdrawal by the petitioner or his wife without the countersignature of the other. In addition to regularly drawing checks against these accounts, Mrs. Bowman frequently negotiated business loans at the above-named banks on her own signature. The income from the sales of wheat and from other sources was deposited in the joint accounts, and the funds therein were drawn upon for amounts due on the purchase price of the various ranches, the purchase of machinery and equipment, payments due on mortgages and bank loans, for operating expenses of the business, and, in addition, for living and personal expenses of the petitioner and his wife and family. Mrs. Bowman handled a large part of the banking and financial affairs of the business, collecting and depositing in the joint accounts amounts received for wheat sold, and drawing and signing checks for current operating expenses and other obligations. She drew *243 and signed the checks for the installment payments and the final payment of $13,344.17 on the Federal farm loan, the final payment of $10,000 on the Hollam ranch, the payment of $1,800 for the Stowe lease, and the repayment of loans by Mrs. Maly for the $2,000 paid on the Longeway ranch and for $2,500 borrowed to purchase tractors and other equipment. The farming operations increased until, in the taxable years, they covered approximately 10,000 acres of land, including land held under lease, and required the employment of from 15 to 30 farm hands during the busy season. The work was carried on with seven combines, four tractors, four seeding machines, a machine for cleaning wheat, and trucks and other machinery. The petitioner devoted much of his time to the repair and maintenance of this equipment. Mrs. Bowman devoted her time to the supervision of the work on the farm and performing some of the manual labor. Domestic help was hired for the household work and to cook for the employees. Mrs. Bowman hauled grain for storage at the grain elevators and for loading on railroad cars at a siding in Belt, and hired crews for loading the grain on the cars at the siding. She hired and discharged *244 employees, including those hired as extra help for the harvest. She ordered and received deliveries of supplies of gasoline and oil, placed insurance on crops, and hired carpenters and mechanics for repairs and alterations of farm buildings. She operated seeding machines and combines, assisted in the operation of tractors, repaired fences, rode the range rounding up cattle, burned stubble in the fields, and took care of the milking. The wheat hauled to the grain elevators was deposited with the Rocky Mountain Elevator Co. at Belt, and sales thereof were made from time to time for the account of the petitioner. The petitioner made the first deliveries and the account on the books of the Rocky Mountain Elevator Co. was opened in the name of "H. R. Bowman." Mrs. Bowman thereafter made most of the deliveries of wheat, and the Elevator Co. executed sales upon orders given by her. The checks for the wheat were issued in the name of the petitioner. At a time not disclosed by the record, the account on the books of the Elevator Co. was changed to the names "H. R. Bowman and Mrs. H. R. Bowman," and checks issued for wheat sold after May 5, 1942, were issued in the name of either the petitioner *245 or Mrs. Bowman, and at times in the name of both of them. The checks issued before and after the account was changed were endorsed by Mrs. Bowman and deposited in the joint checking accounts. For the year 1940, the petitioner, on February 13, 1941, filed an individual income and defense tax return disclosing a net income from farming of $15,049; for the year 1941 he filed a partnership return in the name of himself and Mrs. Bowman disclosing a net income from farming of $29,122.67, and he and his wife filed separate individual returns in which they each reported one-half of the amount, or $14,561.38, as income from the partnership. The 1941 returns were prepared by a deputy in the collector's office at Great Falls. The petitioner told the deputy that he and his wife operated the farms jointly; that some of the land was owned "jointly" and some "separately"; that some of the leases were in his name and some in his wife's name; and that an equal proportion of the operation was carried on by each of them. The deputy told petitioner that if the partnership return was thereafter questioned by the Government it would be up to petitioner to substantiate what he had told the deputy. The *246 1941 returns were filed on March 12, 1942. On May 10, 1943, the petitioner filed partnership returns for the years 1940 and 1942 and an amended partnership return for the year 1941, and, on March 15, 1944, he filed a partnership return for the year 1943, together with separate individual returns for himself and Mrs. Bowman for the years 1940, 1941, 1942, and 1943. All of such returns * were prepared by the petitioner's attorney. The income reported therein was as follows: Partnership
Reported in Separate Returns by
Year
Net Income
Petitioner
Mrs. Bowman
1940
$14,727.16
$ 7,373.58 (Amended)
1941
24,663.11
$12,331.56 (Amended)
12,331.56
1942
28,799.11
14,399.56
14,399.56
1943
38,079.69
19,039.85
19,039.85
The petitioner and his wife were partners engaged in carrying on the business of farming during the taxable years. Opinion The petitioner reported one-half of the net income from the farming operations hereinabove mentioned in his individual separate returns for the taxable years 1940 to 1943, inclusive, claiming that the amount reported represented his distributive share of the profits of *247 a partnership between himself and his wife in which they each owned equal shares. He alleges error by the respondent in refusing to recognize the partnership and in taxing him on all of the net income of the business. The sole issue presented is whether the alleged partnership was a real or bona fide partnership and thus entitled to recognition in determining the petitioner's tax liability under the Federal revenue laws. The petitioner, relying upon the principle announced in , and applied in many subsequent cases, that a wife and her husband may be partners for tax purposes "if she either invests capital originating with her or substantially contributes to the control and management of the business, or otherwise performs vital additional services, or does all of these things," asserts that the evidence shows conclusively that Mrs. Bowman contributed to the business of farming from her own funds more than one-half of the capital and that, in all of the years since 1924, she rendered full-time services, participating equally with the petitioner in the management and control of the business and performing vital services; and he contends *248 that she was a bona fide partner for income tax purposes during the taxable years. The respondent submits that if the above principle is to be applied it is first necessary to establish the fact that a partnership was created and existed under an express or implied contract, and that the petitioner's contention must be denied principally and solely because of his failure to prove that he and his wife entered into a contract of partnership during the taxable years or at any time prior thereto. However, upon the assumption that such contractual partnership relation did exist, the respondent submits as an alternative contention, that the evidence relating to the capital contribution and services of Mrs. Bowman is insufficient to bring the case within the above-stated principle of the Tower case. With respect to the $100 and $1,500 which the petitioner received from his wife in 1916 to 1919, the respondent argues that there is no proof that any part of the money was invested in the business of farming. With respect to the services of Mrs. Bowman, the respondent admits that they were very helpful and of value, but, he insists, that they were rendered as a wife and not as a partner, and *249 are nothing more than such services as might be rendered by the experienced wife of a farmer engaged in a large wheat-raising operation, and that they clearly are not the sort of substantial contribution to the control and management, or the vital services which the Supreme Court mentions in the Tower case. The problem presented by these contentions is to determine whether the evidence is sufficient to establish: (1) That the petitioner and his wife entered into an agreement of partnership; and, if so, (2) that the wife either (a) invested capital originating with her, (b) contributed substantially to the control and management of the business, or (c) otherwise performed vital additional services. We consider these questions in the order in which they are stated. (1) The partnership agreement. We agree with the respondent that a taxpayer claiming the rights of a partner under the income tax law must prove that there was an agreement containing the essential elements of a partnership. Those elements, as stated in the Tower case, are the joining together by two or more persons of their money and services for the purpose of carrying on a trade or business, and the sharing of the *250 profits and losses. If the wife of a taxpayer participates in the business in any one or more of the three particulars mentioned in the Tower case, that fact, standing alone, does not establish that they created a partnership. There must be proof of an agreement or understanding between the husband and wife to become partners, and if the wife contributed her own capital or performed important managerial or other important duties, those facts are strongly indicative of the reality of the arrangement. ; ; ; ; ; ; , Jan. 10, 1949. In the Olinger case we found as a fact that the taxpayer's wife contributed capital originating with her, but, as the record disclosed that the parties never did consider themselves to be partners and had never discussed or reached any understanding concerning the profits, the control of the business, the contributions of capital, or their participating interests, *251 and as there was no evidence from which an agreement of partnership could be implied from their acts or conduct, we held that a partnership could not be recognized. In the present case the petitioner and his wife never executed written articles of partnership. At the hearing the petitioner testified that there had always been an agreement between himself and his wife that they would work together and that if they made any money out of the business they would divide it equally and share equally in the losses. Mrs. Bowman testified that she and petitioner always said that they would have the business together and be partners, and that she at all times considered herself a partner and claimed a one-half interest in the property and the income. In support of his position that the petitioner and his wife did not in fact enter into an agreement of partnership, the respondent points out that their testimony is the only direct evidence in the record on that point and, he argues, that we should disregard it for the following reasons: "* * * the foregoing self-serving testimony of the interested parties is insufficient to establish the existence of a genuine partnership, and that the surrounding *252 facts and circumstances as otherwise established by the evidence not only fail to support, but refute the claim of the petitioner as to the existence of such a partnership need not be further labeled. Where, as here, the business was carried on throughout the taxable years in petitioner's own name and for his account, and there is no evidence of a 'holding out' of petitioner and his wife 'as partners for business purposes' during those years, the present cases may not be said even to be clothed or dignified by the 'type' of 'arrangement' or form alluded to by the Supreme Court in , * * *. The respondent respectfully submits that it is clearly established by the evidence that petitioner's claim that a contractual partnership relation came into existence between himself and his wife on December 4, 1934, or any other date is not only pure fiction, but spurious." Under partnership law an agreement of partnership need not be in writing. The agreement may be oral or the partnership may be implied from acts and conduct of the parties. ; When the agreement is in *253 writing, the agreement in itself is insufficient to prove that the partnership between the husband and his wife is real and genuine so as to entitle it to recognition in determining their tax liability. In the Tower case the Supreme Court said that the real issue in such cases is "who earned the income"; that such issue depends upon whether the parties really intended to carry on business as partners; that all steps in the process of earning profits must be considered - "who worked for, otherwise created or controlled the income"; and that the intention of the parties is a question of fact which must be determined by examining all of the circumstances surrounding the agreement, the terms of the agreement, and the conduct of the parties in execution of its provisions. See also , where it was said: "* * * Family partnerships * * * must be shown to be accompanied by investment of capital, participation in management, rendition of services by the family partners, or by such other indicia as will definitely demonstrate the actuality, the reality, and the bona fides of the arrangement." See also , *254 Jan. 24, 1949. We agree with the respondent that the testimony of the petitioner and his wife respecting their oral agreement is insufficient of itself to prove the existence of a genuine partnership - a real intention to carry on business as partners. Such testimony is entitled no more weight on the question of reality for tax purposes than the written agreement which was before the Court in the Tower case. However, we do not think that the evidence warrants the conclusion that a contractual partnership relation between the petitioner and his wife never existed. The testimony of petitioner and his wife as to the agreement between them is not the only evidence of the agreement of partnership. As will be seen from our later discussion of the evidence with regard to the contributions of capital and services of Mrs. Bowman, she contributed capital and performed important services and there was a community of interest in the profits, and these facts and other acts of the parties corroborate the oral testimony of petitioner and Mrs. Bowman and demonstrate that there was a partnership agreement which was real and genuine. In , the parties did *255 not make an express agreement of partnership, either written or oral, and, as in this case, the Government argued that the taxpayer had failed to prove the elementary facts necessary to establish a partnership generally. The Circuit Court of Appeals held that this was immaterial, as a partnership agreement was conclusively shown by the acts and conduct of the taxpayer and his wife. After referring to the definition of a partnership approved in the Tower case, the Court said: "* * * Mr. and Mrs. Weizer joined together their money and their skill for the purpose of carrying on the scrap material business. The right of each to draw on the joint business account, the withdrawals from the firm's assets for individual purposes without allocation between them, their joint action in major matters of policy, * * * consultation on legal matters affecting the business, and negotiations with the union all strongly show their community of interest in the profits and losses. Profits were distributed by the purchase of property with the firm's assets. * * *" We are of the opinion that the petitioner entered into an agreement of partnership with his wife for the operation of the business of farming. *256 The evidence also convinces us that this agreement was made in 1924 when the farming operations were begun and that it remained in effect throughout the taxable years. (2) Wife's contribution of capital and services. (a) Capital. The farming operations were begun on a small scale and were extended rapidly from year to year through the acquisition with farm earnings of additional tracts of farm land and farm equipment and machinery. The only capital contributed from sources other than such earnings or borrowed money repaid from earnings, consisted of $1,000 paid on the purchase price of the Salem ranch in 1918, and $2,600 invested in equipping the Salem ranch with farm machinery in 1924; and the question is whether those amounts, or any part of them, are capital originating with the petitioner's wife. The pertinent facts concerning these amounts are as follows: The $1,000 and the $2,600 were derived from the radiator and tire repair business operated by the petitioner and his wife for a number of years before engaging in the business of farming. The $1,000 was raised by mortgaging the repair shop for $800 and drawing an additional $200 from its funds. The mortgage loan was repaid *257 out of earnings of the shop. The $2,600 was received as consideration for the sale of the repair business in 1923. The total resources of the petitioner and his wife when they started the repair business consisted of $400 belonging to the petitioner and $150 belonging to his wife, and, after using some of the money for living expenses, the remainder of the fund was used to buy tools and equipment for the shop and pay the first month's rent and other preliminary expenses. Beginning with 1917 the petitioner's wife received payments from a former divorced husband in settlement of her property rights in the total amount of $1,500, and she invested that amount in the business. In 1920 the petitioner and his wife purchased a tire repair business with all of its equipment and they thereafter repaired radiators and tires. The petitioner's wife assisted him in the operation of this business, performing essential services on a full-time basis. She did not receive any salary. The respondent contends that the petitioner has failed to establish what part of the $150 and $1,500, which his wife contributed to the repair business, went into the business of farming, and that the evidence is therefore *258 insufficient to support a finding that she invested in the business of farming any amount originating with her. Where it appears that investment represents funds of another business enterprise in which the husband and wife were jointly interested and which was created by their joint efforts, and where it appears that the wife contributed more than half of the funds required to launch the initial enterprise and more than half of the total amount ever invested by either of them, it is proper to conclude that the wife did make a contribution of capital. ; As we observed in the Drew case, it is not necessary to find that the amount was large or that it can be traced through business transactions and changes, and it is enough if the wife's contribution was a material factor in the establishment and operation of the enterprise. The respondent objects that the petitioner has not shown how much of the wife's first contribution of $150 was used for living expenses and how much was used in the repair business, but this is of little importance since Mrs. Bowman testified that she contributed to the repair *259 business $1,500 received from a divorce settlement with a former husband, and that statement is not disputed. The latter amount is more than 75 per cent of the total capital invested by both of them from sources other than earnings. We are of the opinion that Mrs. Bowman contributed to the farming enterprise capital which originated with her, and we so hold. (b) Services. The respondent contends that Mrs. Bowman's services were clearly not services of the sort described in the Tower case - substantial contributions to the management and control of the business or vital additional services. He admits that she performed many duties and that her work was helpful and of value, but he insists that the petitioner himself managed and controlled the business and made all the decisions, that the minor clerical and manual tasks, ranging from writing checks to ealking cows and driving trucks to town, were performed not as a partner, but merely as "a competent and experienced wife of a farmer engaged in large farming or wheat-growing operations." The extent and character of the services performed by Mrs. Bowman are stated in detail in our findings of fact and need not be restated here. The *260 evidence on this point is contained in the testimony of the petitioner and Mrs. Bowman which is corroborated to a large extent by documentary evidence and the testimony of numerous witnesses with whom the petitioner transacted business. It shows conclusively that she exercised equal authority with the petitioner in the management of the farming operations and that her services were important and vital. In the beginning, she knew more about farming than the petitioner, and, as the business grew to larger proportions over the period from 1924 to 1943, she continued to give full-time service in carrying on the operations. Mrs. Bowman was a contracting party in the purchase of the Eustance and Legault ranches, and a joint tenant of the Hollam ranch; she was the sole lessee of the Stowe, McGiffin, and Red Coulee acreage, and obtained the lease of the latter property of 1,440 acres on her own responsibility. She initiated the plan of refinancing the entire acreage owned in 1934 and was an active participant in the negotiation of the Federal farm loan. She borrowed money for the first payment on the Longeway ranch on her own note. She handled the banking and at all times had authority to *261 draw on the joint bank accounts. She ordered sales of wheat from time to time, hired and fired farm hands, and employed carpenters and mechanics to alter and repair farm buildings. It cannot be said that such matters were not substantial contributions to the control and management of the farming operations. The statement of the petitioner in the application for the Federal farm loan that he farmed the land himself was made merely to inform the bank whether the land was farmed by the owner or tenants. With respect to the work on the land in producing wheat, it appears that Mrs. Bowman not only supervised such operations but also that she operated tractors and other farm machinery and performed some of the manual labor, and her services, in our opinion, were vital as well as managerial in character. We think that the petitioner and his wife entered into an agreement of partnership for carrying on the business of farming, and that there was a real and bona fide partnership under such agreement during the taxable years, and that the respondent erred in including in petitioner's income the part of the partnership's income for the taxable years which was attributable to petitioner's *262 wife. Decision will be entered under Rule 50. Footnotes
*. This return is not in evidence.↩